(Decided April 4th, 1862.)

---

## Mayor & City Council of Baltimore, and the City Collector, *vs.* George U. Porter.

The Act of 1856, ch. 164, for the grading and paving of North Avenue, requires *damages*, as well as benefits, to be assessed upon the owners of adjoining lands, and as a preliminary to any proceeding thereunder, that the Mayor and City Council of Baltimore shall determine the proposed work to be consistent with the public good. These requirements of the law were disregarded, and the city commissioner proceeded to have the work done as if it was the ordinary case of grading and paving a street lying wholly within the limits of the city. HELD:

1st. That all the proceedings of the city commissioner in the premises, were *coram non judice* and void, and a party whose land was about to be sold to pay the tax imposed for such grading, has a right to an injunction to restrain such sale, and a court of equity has jurisdiction to grant the relief.

2nd. Independent of this Act the city authorities had no power to grade this avenue, the land on one side thereof lying in Baltimore county, and in executing the powers thereby conferred, they must conform to the provisions of the law, and to the rules and directions therein prescribed.

3rd. The powers thereby conferred could be exercised by them only in the way in which all their powers are executed, by an ordinance adopted for that purpose, prescribing the officer by whom, and the manner in which, the work should be done, and providing for the time and manner in which the appeal prescribed by the Act, might be had by the parties interested.

4th. The fact that the party asking the injunction to restrain the sale of his property to pay the tax so improperly levied, signed the application to the city commissioner for the grading, does not preclude or estop him from obtaining the relief asked.

5th. An ordinance afterwards passed by the city, and after suit brought, confirming the grading done, was not of binding force, not being authorized

by law, and cannot have the effect of ratifying the acts of the city commis-
sioner, nor in any manner change the rights of the parties litigant.

The two systems, for *opening and condemning* and for *grading and paving*
streets in the city of Baltimore, are entirely different, they are provided
for by different laws and ordinances, executed by different officers, and
governed by different rules and regulations

Where a limited tribunal takes upon itself to exercise a jurisdiction which
does not belong to it, its decision amounts to nothing, and does not create
the necessity for an appeal.

The principles on which a court of equity interposes by injunction to arrest
the illegal proceedings of public functionaries, are well established, and
have been sanctioned and sustained by this court.

APPEAL from the Circuit Court for Baltimore City.

The bill in this case was filed by the appellee against the
appellants, for an injunction to restrain the defendants from
selling the property of the complainant for payment of a tax
assessed thereon, for the grading of North Avenue between
Pennsylvania Avenue and the Falls Turnpike Road.   The
bill alleges, that the defendants have no right to charge the
complainant with this tax, because they have wholly disregard-
ed the provisions of the Act of 1856, ch. 164, for the grading
of this avenue, and from which alone they could derive any
authority to make the complainant or his property liable there-
for.   It also alleges that the proprietors of a *majority* of feet
fronting on the avenue, did not sign the application for grading,
but this allegation was denied in the answers, and formed one
of the subjects of controversy in the case.

The facts appearing in the record, from the bill, answers and
evidence, so far as the same need be stated, are briefly these:
The avenue in question forms the northern boundary of the
city of Baltimore, the land on one side of it lying in Baltimore
county, and on the other in the city, and for this reason the
grading and paving thereof was provided for by the special
Act of 1856, ch. 164.   This law is entitled, "An Act relating
to the grading and paving of North Avenue, in the city of
Baltimore, supplementary to an Act entitled, an Act to vest
certain powers in the corporation of the city of Baltimore, in

relation to streets, passed on the 23rd of March 1839," (Act of 1838, ch. 226.) By sec. 1 of this Act it is enacted:—"That on the application in writing of a majority in front feet of the owners of the land in Baltimore county, and in the city of Baltimore, fronting on said avenue, or on any part thereof, to the Mayor and City Council of Baltimore, to have the same, or such part thereof as such majority may apply for, graded or paved, or both graded and paved, they shall have full power and authority, (*if in their opinion consistent with the public good*,) to allow the same, and to provide for ascertaining whether any, and what amount of benefit *or damage* will be caused thereby to the owners of the land on each side of said North Avenue, both in said city and Baltimore county, for which said owner or owners should be *compensated*, or ought to pay a compensation by reason of the grading or paving, or of both, as aforesaid, and to provide for assessing and levying on the property of persons benefited, within the same limits, the expenses which may be incurred in the grading or paving or both, of said North Avenue, or any part thereof as aforesaid, *in the same manner as is now provided by existing laws and ordinances for the grading and paving of streets in the city of Baltimore.*" By sec. 4, it is enacted:—"That the same right of appeal from any assessment of benefit *or damage* for the grading or paving of said avenue, to the Criminal court for Baltimore city, or Circuit court of Baltimore county, shall be granted to any owner or owners of property aforesaid, under this Act, as is now provided, under existing laws, for appeals within the city of Baltimore or in Baltimore county, in similar cases." After the passage of this Act, a number of proprietors of land, *including the complainant*, representing themselves to be the owners of a majority of feet fronting on this avenue between Pennsylvania Avenue and the Falls Turnpike Road, made application in writing to have the same graded between those points. Upon this application the city commissioner determined to grade the avenue between said points, advertised for proposals, awarded the contract to W. Slater, assessed the tax, and

placed the tax list in the hands of the city collector, who advertised the complainant's property for sale on account of its non-payment. All these proceedings were with the approbation of the mayor, and in all respects in conformity with the ordinances providing for the grading and paving of a street lying wholly within the city limits. The contractor proceeded to do the work and completed the grading at a cost and expenditure of over $100,000. The complainant and others now seeking to avoid payment of the tax, instituted no proceedings to stop the work during its progress, nor made any objection thereto until after the work was finished; and after the same was so completed the Mayor and City Council, on the 9th of December 1858, passed an ordinance declaring, that the contract and all the acts done under and by virtue of the same by the contractor, and all the acts of the city's officers in relation to the grading of said avenue, to be as valid to all intents and purposes as if an ordinance had been passed by the Mayor and City Council of Baltimore, previously to the making of said contract, declaring that the grading of the said avenue would be consistent with the public good, and expressly allowing the same, and further ordaining and declaring, that the grading of said avenue, at the time it was being done, and ever since, and now is, for the benefit of the public, and that the same be and is hereby confirmed and made valid.

The injunction was granted as prayed in the bill, and after answers filed, testimony was taken, the purport of which is sufficiently stated in the opinion of this court, and on the hearing of the motion to dissolve, the court, (KREBS, J.,) on the 2nd of June 1860, passed an order continuing the injunction till final hearing. From this order the defendants appealed.

The cause was argued before LE GRAND, C. J., TUCK and BARTOL, J., and a re-argument was ordered by the court, and the case was again argued before BOWIE, C. J., BARTOL, GOLDSBOROUGH and COCHRAN, J.

: Oral and printed arguments were made and filed in the case by *G. L. Dulany, J. M. Campbell, Geo. W. Williams, Orville Horwitz, Coleman Yellott,* and *H. R. Dulany,* for the appellants; and by *Wm. F. Frick, Chas. H. Pitts* and *Geo. C. Maund,* for the appellees. The grounds upon which the case is decided by this court, renders it unnecessary to state many of the points argued, and only those will be noticed which have reference to the questions decided.

*On the part of the appellants it was argued:*

. 1st. There is some difficulty in ascertaining the true construction of the Act of 1856, ch. 164, but the interpretation that best harmonizes the various provisions of the law, seems to be, that the *legislative intention* was to apply, to the grading of North Avenue, a system composed of a *combination* of the provisions of the acts and ordinances relating to the grading and opening of streets in the city of Baltimore.

. 2nd. It was not necessary that the city authorities should have directly declared, by the passage of *an ordinance,* that the work contemplated was *"consistent with the public good."* The Act does not say such an ordinance shall be passed, and wherever an ordinance is expressly required, it is so provided. Any circumstance from which it might be inferred that such, in reality, was their judgment upon the matter, would be amply sufficient to satisfy the requirements of the Act. The assent of a corporation may be presumed as well as that of an individual. The fact, that the grading was done under the superintendence, and by the authority of a city official, and that the Mayor and City Council *allowed* the same to be proceeded with, made and accepted the contract for doing it, afford just grounds for the presumption, that they regarded the undertaking as not detrimental to the interests of the community, but as "consistent with the public good." After the work was completed, an ordinance was passed, December 9th, 1859, approving of the same as consistent with the public good, and this subsequent declaration is equivalent to a previous expres-

sion of opinion to that effect: this ordinance was *valid*, for every *retroactive* ordinance may be good which does not disturb vested rights. But again, this provision of the law was introduced solely for the benefit of the public, and can only be urged, therefore, by those who represent the interests of the community at large; the appellants (the defendants below) do not set up any such defence, though they are the only parties who could take advantage of it.

3rd. That part of the law which says the city authorities shall have power to provide for ascertaining the benefit or damage to the property-owners by the grading or paving, or both, is said not to have been complied with. This part of the Act is borrowed almost *verbatim* from the Act of 1838, ch. 226, to which it is expressly made a supplement, and the city authorities had already passed an ordinance in conformity with the requirements of the Act of 1838, regulating the assessment of benefits and damages, not only in case of lots situated in the city, but also where they were located adjacent thereto. There was no need, therefore, of any further action on the part of the corporation, as the legislative purpose could be fully effectuated by the ordinances already in existence. This avenue had been condemned, and opened as a public highway, *and its grade fixed* prior to the passage of the Act of 1856. The damages awarded on the condemnation of the property along its line, for the purposes of this avenue, included not only the actual value of the property taken, but the injury to the residue thereof, by reason of the intention to make a street at a grade higher or lower than the grade of the property not taken. For this anticipated injury full compensation was allowed:—the future injury that may result from an inconvenient grade is paid in advance at the time of condemnation. 11 *G. & J.*, 398, 404, *Canal Company vs. Grove.* It is manifest, therefore, that in 1854, when this avenue was condemned and opened as a public highway, *all* damages to the property owners, present and future, arising from the grade fixed the year previously, were either allowed in fact or in law. If this view is correct, then

37    v.18

the clause in the Act of 1856, now under consideration, is nugatory, because it provides for ascertaining that which has already been ascertained and paid for, and unconstitutional, because it provides for the assessment and levying a second time on property, damages which have already been assessed and paid. If the law is read with this clause omitted, it is intelligible, and was properly executed by the city officers.

4th. But it is said the city authorities also neglected to provide for assessing and levying on the property of persons benefited, the expenses of the grading or paving. But the law says this assessment and levy shall be provided for, "*in the same manner as is now provided, by existing laws and ordinances for the grading and paving of streets in the city of Baltimore.*" It seems clear, looking to the purpose of this Act, that there was no need of any action on the part of the Mayor and City Council. The requisite machinery, as designed by the Legislature, for assessing and levying the expenses of grading this avenue, had already been created by city ordinances, and is expressly recognized by the law itself. There was nothing left but to apply this precisely as it existed in the city, to the county. This could be done as well without as by the interposition of the corporate authorities. It was therefore, evidently, never the intention of the Act to make the levying and assessing of expenses altogether dependent upon the action of the Mayor and City Council. By referring to a perfect system already in existence, as applicable to this avenue, it *ipso facto* transfers that system, and *makes* it *applicable* to the avenue. It executes itself. Any other construction would make the Legislature insist upon that which could answer no purpose whatever, but, on the contrary, would be highly unreasonable.

5th. Not only is the appellee, by signing the application to grade, in which the signers are represented to be the owners of a majority of feet, absolutely estopped from taking the objection, that the requisite majority in front feet did not sign, but, by that application, and by the fact that he stood by and saw

the grading going on and completed, he is estopped from objecting to paying for the same on any grounds which he might have urged prior to the commencement or completion of the undertaking, on the equitable principle, that he, who with a knowledge of his rights, or of the facts from which his rights arise, permits another to do or continue an act which he has power to forbid, is estopped from afterwards asserting those rights to the detriment of that other. 1 *Johns. Ch. Rep.*, 344, *Wendell vs. Van Rensselaer.* 9 *Barb.*, 17, *Hall vs. Fisher.* 3 *Mylne & Keen*, 632, *Parrott vs. Palmer.* 1 *California*, 455, *Weber vs. City of San Francisco.* 6 *Johns. Ch. Rep.*, 166, *Storrs vs. Barker.* 11 *G. & J.*, 256, *Neptune Ins. Co.*, *vs. Robinson.* 8 *G. & J.*, 93, *Savings Institution vs. Schroeder.* 8 *Metc.*, 180, *City of Lowell vs. Hadley.*

6th. Where a right of appeal is given from a judgment, or proceedings at law, by statute, a court of equity will never interfere, and has no jurisdiction to interfere by injunction, as a measure of relief to a party complaining of a violation of his rights by the inferior or special tribunal. Now, whatever may be doubtful in the construction of the Act of 1856, it is certain that, by its fourth section, a right of appeal is secured to the owners of lots assessed, and, upon such an appeal, justice would have been done to both parties, whilst the injunction, if perpetuated, will leave to the contractor no remedy whatever—he will have suffered a total loss of the great expenses of this whole work, and be a ruined man. The right of appeal having been thus given to the appellee in a full and ample manner, he cannot apply to a court of equity for its interference in his behalf. 6 *Gill*, 391, *Methodist Church vs. Mayor & C. C. of Balt.* 6 *G. & J.*, 298, *Ranahan vs. O'Neale.* 6 *G. & J.*, 309, *Gott vs. Carr.* 8 *Gill*, 433, *Richardson vs. Mayor & C. C. of Balt.* 2 *Md. Rep.*, 320, *Brumbaugh vs. Schnebly*, and case of *Derickson, et al., vs. Predeaux, et al.*, cited in the note, page 325. 8 *G. & J.*, 340, *Glenn vs. Fowler.* 8 *G. & J.*, 170, *Dilly, et al vs. Barnard.* 5 *Gill*, 383, *Alexander, et al., vs. Mayor & C. C.*

*of Balt.* The case of *Holland vs. Mayor & C. C. of Balt.*, 11 *Md. Rep.*, 186, arose under an application to pave, under the general legislation of the city and its ordinances on the subject. In such a case there was *no right of appeal*, and where such is the case, the only remedy for parties aggrieved, is by injunction. But here, as already stated, by the special provision of this Act of 1856, an appeal is secured.

7th. In respect to all the objections which appear on the face of the proceedings, (which includes all save that based on the want of a majority of owners of front feet,) *certiorari* was the appropriate remedy, and a court of equity, therefore, had no jurisdiction. *Ev. Pr.*, 383 to 389. 8 *Gill*, 150, *Swann vs. Mayor & C. C. of Cumberland.* 1 *G. & J.*, 197, *Williamson vs. Carnan.* 16 *Johns.*, 50, *Wildy vs. Washburn*, 15 *Md. Rep.*, 197, *Turnpike Co., vs. Northern Central Railway Co.*

On the part of the appellee it was argued:

1st. In this case the city has attempted to divest the appellee of his property—to charge it with the cost of a public improvement, and enforce payment of the charge by a sale. When such an act is done by the State or the city, it is the exercise of a high prerogative of sovereignty, (4 *G. & J.*, 175, *Canal Co. vs. Railroad Co.*,) and the Act conferring the power must be strictly complied with; without the explicit sanction of the Legislature, the city can have no shadow of power to sell the appellee's property, and with such sanction, as the power is a most delicate one and liable to abuse, she must proceed with caution. Nothing prescribed in the Act, which confers the power, material to the protection of the citizen, can be omitted. Specially delegated powers must be strictly pursued, and when the statute prescribes the mode of executing the power, it can be executed in no other way. Upon this doctrine, vital and fundamental, the authorities are unanimous. 4 *Hill*, 81, *Sharp vs. Speir.* 4 *Pet.*, 167, *Beatty vs. Knowler.* 11 *G. & J.*, 56, *Barrickman vs. C.ms. of*

*Harford Co.* 7 *H. & J.*, 91, *State vs. Merryman*. 8 *Gill*, 154, *Swann vs. Mayor & C. C. of Cumberland*. 10 *G. & J.*, 374, *Root vs. State*. 21 *Eng. Law & Eq. Rep.*, 625, *Mayor of Liverpool vs. Chorley Water Works*.

2nd. If the city ever acquired power to grade this avenue, the power was never exercised. The Act of 1856, gave the power to the Mayor and City Council of Baltimore, to allow the grading, if in their opinion *consistent with the public good*, and to provide for ascertaining whether any and what amount of damage would be caused thereby to the owners of property on either side thereof, and for assessing the expenses on the property and persons benefited. But the city authorities never considered the subject, nor made any provision for accomplishing the designated objects, nor took any action in the matter whatever. Whatever the true construction of the Act may be, an ordinance was absolutely essential to put it in operation. How else, than by an ordinance, can the city assent to and exercise powers vested in it by the Legislature? The clause, "if in their opinion consistent with the public good," shows the necessity of an ordinance. It presents a question exclusively for the consideration of the Mayor and City Council. 6 *Gill*, 400, *Methodist Church vs. Mayor & C. C. of Balt.* 6 *H. & J.*, 383, *Mayor & C. C. of Balt. vs. Howard.* But it is said the ordinance of December 9th, 1859, passed several months after the injunction in this case had been granted, confers validity upon the commissioner's proceedings. This ordinance is an assumption of authority which the city did not possess. Her powers were derived exclusively from the Act, which gives no right to confirm, as against the appellee, proceedings which were void. 3 *Denio*, 599, *Doughty vs. Hope.* This ordinance should have been passed before the work was *"allowed"* to be done;—it can have no retroactive efficacy.

3rd. If the city has ever exercised the power to grade and assess, it has done so in a manner so essentially distinct from and repugnant to the provisions of the Act, that its proceedings are a nullity. This proposition depends upon the meaning and

intention of the Act of 1856. The appellee insists that the Act clearly requires an ascertainment of benefits and ·damages; that the assessment should be made upon the property benefited, and in proportion to ·the amount of benefit. Is not this the true interpretation of the Act? Not only must a statute which divests the owner of his property, be strictly pursued, but it must be strictly construed. A power derogatory to private property .must be construed strictly—so also where extraordinary powers are granted, affecting property of in-dividuals. 9 *Law Lib.,* 750. 4 *Hill,* 84; *Sharp vs. Speir.* The interpretation of the appellee, that the owners of pro-perty damaged should be compensated, and that property benefited should be proportionately assessed, is, in its re-sults, fair and equitable, while the enforcement of the views of the appellants is proved, by all the testimony in the case, to be in the highest degree unjust and oppressive. We should not lightly impute to the Legislature an inten-tion to perpetrate so intolerable a wrong upon private rights of property. But such intention is not clearly expressed, and can only be inferred by ingenious speculation upon a sin-gle clause of a few words, at variance with the whole body of the Act. The Act is made, by its title, supplemental to that of 1838, ch. 226, and, in the ·construction ·of an Act, its title and preamble may be regarded. 4 *G. & J.,* 1, *Canal Co. vs. Railroad Co. Dwarris on Stat.,* 654, 694. 7 *G. & J.,* 274, *Kent vs. Somervell.* 12 *G. & J.,* 17, *Lucas vs. McBlair.* The language of a greater part of its first section is a transcript, or nearly so, of the Act of 1838. The powers conferred by this language have been construed, by the Mayor and City Council, by ordinances, and carried into practice in many in-stances, and during many years, and their construction and practice have received the sanction of this court. 5 *Gill,* 384, *Alexander vs. Mayor & C. C. of Balt.* The only difficulty in construing the Act, is presented by the last clause in the first section, to wit: "In the same manner as is now provided by existing laws and ordinances for the *grading and paving*

of streets in the city of Baltimore." The existing laws and ordinances did not require an ascertainment of benefits and damages, but authorise the expenses of the work, to be assessed in the form of a grading or paving tax on the property fronting on the street to be paved, *equally per front foot*, and from this tax there is not provided a right of appeal. Thus the *two words* "grading and paving," introduce confusion into the Act, and conflict in its provisions. They are clearly an accidental substitution for the words "opening and widening," or "laying out and opening," which would have furnished an apt reference to the Act of 1838, and the ordinances passed in pursuance of it. 6 *Hill*, 617, *Watervliet Co. vs. McKean.* 1 *Pick.*, 105, *Shrewsbury vs. Boylston.* 8 *Md. Rep.*, 456, *Brown vs. Somerville.* The appellee insists, therefore, that an ordinance providing for the ascertainment of benefits and damages, *expressly*, under the Act of 1856, was absolutely necessary. 6 *H. & J.*, 388, *Mayor & C. C. of Balt., vs. Howard.* But it is said the *damages* have already been presumptively ascertained and paid, under the proceedings for "opening and condemning" this avenue, and that the Act of 1856, in providing for their being paid a second time, is void. The answer to this is, 1st, that upon the condemnation of the avenue, no assessment or estimate was made of the benefits and damages that would arise out of its being graded; and 2nd, that no intendment of law can be allowed that such an estimate was made, for the reason, that the laws and ordinances under which the commissioners acted, *gave them no power* to make it. They had no authority to ascertain and assess damages, other than the value of *the bed of the avenue*, and therefore no presumption of law arises, (as in *Grove's case*, 11 *G. & J.*, 398,) on the ground that it was their right and province to make any further estimate.

4th. As to *estoppel*, by signing the application to grade, and permitting the work to go on without objection:—The rule is, that the acts of a corporation, unauthorized by its charter, though assented to by the person dealing with the corporation,

bind no one. 3 *Wend.*, 482, *North River Ins. Co. vs. Law-
rence.* 5 *Conn.*, 560, *Firemen Ins. Co. vs. Ely, et al.* 8 *G. &
J.*, 319, *Dandridge's case.* There is no evidence that the prop-
erty holders had actual knowledge of the progress of the work,
but granting that they knew the city was constructing this ave-
nue, there was no notice to them, or any of them, prior to the as-
sessment of the tax, and the attempted sale of their lots, that
there was to be no assessment of benefits and damages, under
the Act of 1856, no appeal from such an assessment, no pas-
sage of a city ordinance to provide for securing the rights and
privileges expressly conferred by that Act. What reason had
any of them to suppose, that when the work was done it was
the intention of the city, or its officers, to disregard the plain
provisions of that Act, and impose an enormous ratable tax *per
front foot*, on all the property, without inquiring whether it
was lessened or improved in value, by the grading? The par-
ties injured had a right to expect just compensation, as the Act
provided they should, and until these reasonable expectations
were defeated, there was neither motive, justification, nor equi-
table grounds for interfering, by injunction, with the proceed-
ings by the city and its officers.

5th. As to jurisdiction in equity :—The principle upon which
a court of equity will interpose to enjoin a sale in cases like the
present, is set forth in *Holland's case*, 11 *Md. Rep.*, 186. The
broad principle of that case is, that if, for any reason whatever,
the threatened sale would *be void*, equity will restrain the sale,
to avoid multiplicity of suits, and to prevent a cloud from being
thrown upon the title. See, also, *Steuart's case*, 7 *Md. Rep.*,
515. But it is said that the proper and only remedy was by an *ap-
peal*. In answer to this, the appellee insists that the Act of 1856
does not, of itself, *grant* an appeal, but merely authorizes the ci-
ty authorities to provide, by ordinance, for the exercise of the
right, and no such ordinance was ever passed. But whether we
consider the Act itself as *granting* the appeal, or as merely autho-
rizing the city to provide for the exercise of the right, it is equally
clear, that, from the proceedings of the city commissioner, the

appellee never had any privilege of appealing. Again, the proceeding was entirely void—there was no appeal, and no necessity for an appeal from it; and the only remedy of the appellee against an unauthorized sale of his property, was by injunction, or by treating the sale as void, and resisting the claims of any purchaser.

GOLDSBOROUGH, J., delivered the opinion of this court.

For several years prior to the incidents which induced the controversy in this case, the city of Baltimore was blessed with a prosperity strikingly illustrated by its material expansion. The waste places within her jurisdiction were, day by day, disappearing under the advance of this expansion. Her highways were being extended, and were affording uninterrupted intercourse to her citizens from one extremity of the city to the other. This state of prosperity begat a corresponding public feeling, from which, in 1852, arose the determination to lay out and establish an avenue one hundred feet wide on the confines of the city, to be denominated the North Avenue. In that year, certain real estate was condemned, to form the bed of this improvement, between Pennsylvania and York Avenues, under an ordinance of the corporate authorities, by which it was declared that the opening and condemnation of North Avenue, as a public highway, would be a great public improvement and result advantageously to the community. Though the bed of the avenue had been condemned for several years as a public highway, it continued useless for that purpose for want of authority to grade it. It became, therefore, necessary to obtain the passage of a law, under the provisions of which, it could be made practically useful as a great public convenience. And for this purpose the Act of 1856, ch. 164, was passed. After the passage of that Act, a number of the proprietors of land lying upon the avenue, representing themselves to be "the owners of a majority of front feet," made application to the city commissioner to have the same graded.

Upon this application, the city commissioner went on to have the work done, and assessed upon the property a tax to pay the cost and expense of the grading, making such assessment upon all the adjoining property equally, according to the number of front feet, in the same manner as in the ordinary case of a street lying wholly within the limits and jurisdiction of the city, and without making any ascertainment of damage to the owners, or any of them. He then proceeded to place the tax list in the hands of the collector, who advertised the property of the appellee for sale, on account of its non-payment.

An injunction was granted by the Circuit court, at the instance of the appellee, to prevent the sale, and this appeal was taken from the order of the 2nd of June 1860, continuing the injunction.

A great deal of evidence was taken in the case upon the disputed question, whether the application, for the grading of the avenue, had been signed by persons owning a majority of the feet fronting thereon, as required by law, and also for the purpose of showing the manner in which the work of grading had been done, and the consequent damage and injury alleged to have been suffered by many of the adjoining proprietors.

But, in disposing of the present appeal, it is quite unnecessary to decide upon those questions, or to pass upon the various exceptions to the evidence presented in the record. The affirmance of the action of the Circuit court, may be properly rested on the broad ground, that the city commissioner had no legal power or authority to cause North Avenue to be graded, and that all his proceedings in the premises, were *coram non judice* and void. This conclusion is based on the construction of the Act of 1856, ch. 164.

By reference to the pre-existing laws and ordinances, it will be seen, that the two systems for opening and condemning streets, and for grading and paving them, are essentially different from each other; they are provided for by different laws and ordinances, executed by different officers, and governed by different rules and regulations.

This will plainly appear by reference to the Revised Ordinances of 1850, Nos. 15 and 17, and the Acts of Assembly under which they were respectively adopted.   In passing the Act of 1856, ch. 164, the Legislature seems to have blended the two systems, and hence, some difficulty has arisen in giving such construction to that Act as will make all its provisions harmonize with each other.   In its title it is declared to be supplementary to the Act of 1838, ch. 226, which relates to opening and condemning streets.   In its first section it contains, like the Act of 1838, provisions for ascertaining the damages as well as the benefits, which will be caused to the owners of adjoining lands by the grading, and requires, as a preliminary to any proceeding under the law, that the *Mayor and City Council shall determine the proposed work to be consistent with the public good.*   And the fourth section provides that an appeal shall be granted to the owners of property, from the assessments of benefit and damage arising from the grading or paving of the avenue.

In these respects the law is very similar, in its provisions, to the Act of 1838, and wholly unlike the existing laws and ordinances relating to the grading and paving of streets in the city of Baltimore.   In the action that was taken by the city commissioner, those provisions of the law were wholly disregarded, and the record shows that he proceeded in the same manner as is contemplated by ordinance No. 15 of 1850, and as in the ordinary case of a street lying in the city, with the property adjoining thereto, on both sides, within the city jurisdiction.   Inasmuch as the property adjoining North Avenue, on one side, lies in the *county* of Baltimore, it was not competent for the Mayor and City Council to make any assessment on such property for the expense of grading and paving it, without some further legislation on the subject: hence the necessity for the Act of 1856.

The great extent and cost of the work, the irregularity of the surface over which it passes, with the very great embankments and excavations required, and the consequent damage that

might result to some of the adjoining property from the grading, no doubt suggested to the Legislature the propriety of making different provisions of law, from those applicable to the ordinary cases of grading and paving a street, lying wholly within the limits of the city. However that may be, it is sufficient to say, that, independent of the Act of 1856, the city authorities possessed no power to grade the North Avenue.

Their powers being derived under that Act alone, within its provisions are to be found prescribed the rules and directions, to which the Mayor and City Council must conform in executing those powers.

It was not a case to which the ordinance No. 15 of 1850 was at all applicable; and the city commissioner acting under that ordinance, possessed no jurisdiction or authority to act in the matter.

The power is conferred, by the Act, on the Mayor and City Council, and could be executed by them, only in the way in which all their powers are executed, by an ordinance adopted for that purpose, prescribing the officer by whom, and the manner in which, the objects of the law should be accomplished; and providing the time and manner in which an appeal might be had, by the parties interested.

Being a work of great magnitude and expense, involving not only private interests, but also of public concern, the Act requires that the Mayor and City Council shall first determine that it is "consistent with the public good."

No such preliminary determination was made, nor was the application addressed, to them or any action had by them upon the subject.

Under these circumstances, it is impossible to say, that the action of the city commissioner was authorised by any law or ordinance, without which, the payment of the tax assessed by him, cannot be enforced by a sale of the appellee's property.

It was urged, that as the appellee signed the application to the city commissioner for grading the "North Avenue," he should be precluded from taking advantage of the want of au-

thority to perform the duties under the Act of 1856. We do not think that this proposition is tenable. If the appellee was ignorant of the duties of the commissioner, and signed an application which it was not lawful for that officer to entertain, it would not preclude the appellee from availing himself of the nullity of the subsequent proceedings, certainly, it would not debar him from interfering to stop an unlawful sale of his property, which would have been one of the consequences of the act of the commissioner.

The principle of estoppel has no application to the case. The law requires the application of the owners of a majority of the feet of property fronting on the avenue, before any steps can be taken by the corporation to have it graded; but, because the appellee has signed such an application, it surely cannot be succesfully maintained, that he assented that the work should be done in any other way than the law requires, or if he had so assented, that such assent could confer any power upon the city commissioner, not possessed by him under the laws and ordinances of the city.

The ordinance afterwards passed, on the 9th day of December 1859, to confirm the grading of North Avenue, not being authorised by any law, was not of binding force, and could not have the effect of ratifying the acts of the city commissioner, or in any manner change the rights of the parties litigant.

In the argument of the case, the question of jurisdiction was argued with great ability. The counsel for the appellant insisted that a court of chancery has no jurisdiction to grant the relief asked for in the bill, the only remedy being in a court of law, by an appeal from the proceedings of the city commissioner, under the Act of 1856, or by *certiorari*, and the case of the *Methodist Church vs. The Mayor & City Council of Balt.*, 6 *Gill*, 391, was referred to in support of this position. But that case is unlike the present. There, the street commissioners were acting within the scope of their authority, and if the allegations of the bill were true, the acts complained of were but irregularities, subject to be reviewed, on appeal, by the

tribunal appointed by law for that purpose. Here the city commissioner acted without any lawful authority. His acts are not merely irregular, but void. In 8 *Howard,* 543, the Supreme court say: "The rule is, that where a limited tribunal takes upon itself to exercise a jurisdiction, which does not belong to it, its decision amounts to nothing, and does not create a necessity for an appeal."

The principles on which a court of equity interposes by injunction to arrest the illegal proceedings of public functionaries, are stated by Lord Chancellor Cottenham in *Frewin vs. Lewis,* 4 *Mylne & Craig,* 19 *Eng. Ch., Rep.,* 249, cited with approbation by Mr. Justice Story, in 2 *Story's Eq.,* sec. 955 *a.* In *Holland's case,* 11 *Md. Rep.,* 186, the jurisdiction of the court of chancery was maintained, under circumstances and upon grounds which completely cover this case.

*Order affirmed and injunction made perpetual.*

(Decided April 9th, 1862.)