LAURA PATTERSON ET AL.

*vs.*

MAYOR AND CITY COUNCIL OF BALTIMORE.

*Streets*: *opening of—; condemnation proceedings; Baltimore
City; assessments for benefits; elements to be considered;
grade to be first established; "plans as proposed."*

In estimating damages for land taken under condemnation
proceedings, its availability or adaptability for special pur-
poses is an important element.                           p. 649

Although the tract, through which condemnation is sought
for the purpose of opening public streets, may be unimproved
and undeveloped, evidence is admissible to show its availability
for city lots, and to show any special advantages of particular
parts of the land for residential or industrial purposes.

pp. 649-650

In estimating damages in condemnation proceedings, it is for
the jury to assess damages according to the plans as proposed,
and evidence of "what plan would be of the highest utility to
the property" is inadmissible.                          p. 651

A municipality is presumed to open streets for the public
good.                                                     p. 651

Prior to Chapter 32 of the Acts of 1912, Baltimore City
could not include provisions for *grading*, in ordinances and con-
demnation proceedings for *opening* streets.              p. 655

In such cases, the city, as to the question of benefits to be
assessed, was limited to the results to follow from the *opening;*
and the benefits to be derived from the grading, paving and
curbing of the street could not, at the same time, be then con-
sidered.                                                  p. 658

The Act of 1914, Chapter 125, amending the Charter of
Baltimore City as to street opening cases, is not applicable to

proceedings under an ordinance adopted prior to the passage of the Act of 1912, Chapter 32, and expressly excepted from the operation of that Act.                              pp. 656, 659

In cases where the question of benefits to be assessed for grading and paving are properly involved, the jury should be informed as to the width of the driveway and sidewalks to be adopted.                                     pp. 659-660

To allow maps and charts to be shown the jury and explanations on a blackboard is in the discretion of the trial court.

p. 651

A prayer inconsistent with an instruction already granted is erroneous.                                          p. 660

*Decided June 26th, 1917.*

Appeal from the Baltimore City Court. (HEUISLER, J.)

The facts are stated in the opinion of the Court.

The following is Prayer No. 3 of the appellees, which the Court directed to be printed with the report of the case:

*City's Prayer No. 3.*—The jury are instructed that the measure of damages in this case is the market value of the property taken by the City of Baltimore, in this proceeding, at the time of the taking, considered without reference to the opening of Twenty-fifth street or any effect that such opening may have upon the property; and, in addition, such damage, if any, as may, by such opening, have been caused to the remaining property concerned. The fair market value of the property taken is the price that a purchaser willing but not compelled to buy would pay for it, and which a seller willing but not compelled to sell would accept for it.

They are further instructed that the measure of benefits is the increase in the market value of the property in controversy caused by the opening of Twenty-fifth street through the said property; and that this increase should be considered as the amount which a purchaser willing but not compelled to buy the property would pay for it, and which a seller willing but

not compelled to sell, will accept for it, after Twenty-fifth
street shall have been opened, graded, paved and curbed; it
being proper to take into account the fact that the property
owner will be burdened when the street shall be paved, with
the special paving tax of fifteen cents for each front foot on
each side of said street for a period of ten years as a matter
of law; and that, as a matter of fact, in order to utilize this
property, it will be necessary for the property owner to pave
the sidewalk and to grade the property back to a usable depth
in connection with that street.    (*Granted.*)

For convenience of reference, the following prayers of the
appellant, viz., the 3rd, 5th, 6th and 10th, and the City's
Prayer No. 7 also, are inserted:

*Petitioners' 3rd Prayer.*—In considering the value of the
land taken, the jury must award the fair market value of the
petitioners' land as between a seller willing but not anxious
to sell and a purchaser ready but not obliged to buy, having
regard to its highest utility—that is, the utility for which the
jury may find it would command the highest price in the
market.    (*Refused.*)

*Petitioners' 5th Prayer.*—The jury are instructed that
these proceedings are for the purpose of acquiring title from
the petitioners, Laura Patterson and Sidney T. Dyer, and
other land owners to a strip of land from Greenmount avenue
to the Harford road as shown on the condemnation plat offered
in evidence, to be used as a street, and are not proceedings
for the grading, paving or curbing of the street; and the jury
must not assess any benefits which they may find would be
derived by the petitioners from the grading, paving or curb-
ing of the street after title to the same has been acquired, but
must confine themselves to such benefits, if any, as they may
find would result directly to the petitioners from the acquisi-
tion of title to said land to be used as a street.    (*Refused.*)

*Petitioners' 6th Prayer.*—This is not a proceeding for the
grading or paving of Twenty-fifth street, and the jury must
not include in their award of benefits, if any, any benefits

which they may find the property of the petitioners, Laura Patterson and Sidney Turner Dyer, would derive from the grading or paving of Twenty-fifth street. (*Refused.*)

*Petitioners' 10th Prayer.*—The measure of benefits is the difference between what would be the actual market value of the land of the petitioners on which the benefits are sought to be assessed, at the present time, if Twenty-fifth street were not to be opened as projected in this proceeding, but if all other conditions remained as at present and the actual market value which said land will have after the title to the bed of Twenty-fifth street from Greenmount avenue to the Harford road has been acquired by the city under this proceeding to be used as a street, but before said Twenty-fifth street has been graded, curbed or paved.

If the jury, in arriving at their assessment of benefits, if any, consider the market value which the remaining property of the petitioners will have after Twenty-fifth street is graded, and after the said abutting property of the petitioners is graded so as to be beneficially usable in connection with Twenty-fifth street as so graded, they must deduct from that value the sum of the following items and treat only the balance as the amount to be assessed as benefits. The items to be so deducted are:

(1) The cost of grading the street, including the sidewalk in front of the petitioners' property;

(2) The cost of grading the abutting property of the petitioners so as to be beneficially usable in connection with the street as so graded; and,

(3) The present market value of such abutting property of the petitioners at the present time on the assumption that Twenty-fifth street were not to be opened.

If the jury consider the value which the property will have after Twenty-fifth street is paved, they must deduct in addition to the items above mentioned the total cost of paving the street in front of the property of the petitioners, and assess as benefits only the balance, if any, remaining after making all of such deductions. (*Refused.*)

*City's Prayer No. 7.*—The jury are instructed that, in considering the benefits that will be conferred by the opening of Twenty-fifth street upon the property abutting on it, they are to consider all the street facilities which would fairly and reasonably be consequent upon the construction of the street. *(Granted.)*

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER and STOCKBRIDGE, JJ.

*Arthur W. Machen, Jr.,* and *Raymond S. Williams,* for the appellant.

*George Arnold Frick, Assistant City Solicitor,* and *S. S. Field, City Solicitor,* for the appellee.

BOYD, C. J., delivered the opinion of the Court.

This is the second appeal by the appellants in a proceeding for the condemnation and opening of Twenty-fifth street from the east side of Greenmount avenue to the west side of Harford avenue, under Ordinance No. 416 of the Mayor and City Council of Baltimore, approved December 9th, 1909. The former appeal is reported in 127 Md. 233. There are thirty-seven exceptions in the record—the last one presenting the rulings of the lower Court in rejecting eleven of the appellants' thirteen prayers, and granting the city's third and seventh prayers and overruling the special exception to the city's seventh prayer, and the others containing exceptions to rulings on the evidence.

The first twenty exceptions relate to damages. Undoubtedly an important element in estimating damages for land taken under condemnation proceedings may be its availability for or adaptability to certain purposes. In this case, although the tract of land owned by the appellants had not been laid out into lots but had been held by them and those under whom they claim for many years as an unimproved and undeveloped tract of land, it was admissible to show that it was

available for city lots, and to point out the special advantages
for residential or industrial purposes the particular parts of
it had. In the testimony of Mr. Atwood, a witness for the
appellants, who was shown to be an experienced civil engineer·
and surveyor, and had been a commissioner for opening
streets for one term and city surveyor for two terms, he was·
permitted to state fully his views as to the effect of locating
Twenty-fifth street according to the location made in these
proceedings. The appellants, however, did not deem that
sufficient, but sought to introduce two plats made by the wit-
ness. The first, second, third, fourth, fifth, sixth, eighth,
ninth, tenth, twelfth, thirteenth and ninteenth exceptions re-
late to those plats. The Belt Line of the Baltimore & Ohio
R. R. Co. runs through the tract of the appellants—dividing·
it into two parts of about equal areas, each part containing·
in the neighborhood of fifty acres. It is only the part south
of the railroad which is involved in this case. Mr. Atwood
testified that Twenty-fifth street, as proposed to be located,.
was 100 feet wide and runs, roughly speaking, parallel with:
the railroad and approximately from 100 to 120 feet from
it. His theory was that by thus laying out the street, the·
depth between the railroad and the north side of the street
was not sufficient "to utilize it for most businesses of any
large character," and if that side of the street was used for·
residences they would run back to the railroad, which would
be disadvantageous to them. He spoke a good deal about the·
irregularly shaped lots, and said that the proposed location
of the street had the effect of forcing the irregularities to the·
south of the street, instead of putting them along the railroad..
The lots were not actually laid out on the ground, and the
plats prepared by him were simply of a plan he proposed as
the best method of developing the tract. While we do not·
see any particular injury that would likely have been done·
by admitting the plats in evidence, it is possible that they
might have misled and confused the jury, rather than helped·
them. The jurors were taken upon the ground, and could
see for themselves the actual conditions there. Presumably·

the location of the proposed street was pointed out to them,
as well as such other locations as were relevant. Considerable
discretion in such matters must be left to the trial Judge,
and if there be room for a difference of opinion as to whether
the plats offered by the appellants could have aided the jury,
without the danger of misleading them, the action of the
lower Court was at least within the discretion that must be
allowed it—especially was that so as to the plat on the black-
board referred to in the third exception. The plat used in
the condemnation proceedings and one used by the appellants
at the former trial were before the jury, and with a witness
as intelligent as Mr. Atwood on the stand, there ought to have
been no difficulty in his making his views plain to the jury
with the use of the plats which were before them, for all
legitimate purposes. There was, therefore, no reversible error
in the rulings in any of those exceptions, although some of
the questions ruled out, possibly might have been admitted
without injury.

In the seventh exception Mr. Atwood was asked to say
whether he was able to state whether or not this land "pos-
sesses a special adaptability for use for the laying out through
the same, of streets or roads or rights of way for the purpose
of constructing or making or creating building lots or lots for
commercial and industrial purposes, and if so, *state to the
jury what plan would be the highest utility of this property
for those purposes?*" He was permitted to answer the ques-
tion except as to the last clause, which we have italicized.
The Court was clearly right in excluding that. The question
for the jury was not "what plan would be the highest utility
of this property," but what damages the appellants were en-
titled to by reason of taking the land, in the way proposed.
It may be that some other plan might produce better results
to the appellants than the one proposed, but if that be so, that
was one of the questions the jury could consider. The city
can not be required to adopt the plan which "would be the
highest utility of the property" for the purposes named and
to permit different experts to answer such a question, we

might have as many opinions as there were experts. They would soon get into the realms of speculation. This record well illustrates how conflicting the views of experts are on such questions, and while their opinions, if kept within proper bounds, are admissible and helpful, if not, they are confusing and of no use in attaining the ends of justice. Mr. Atwood was permitted to testify to the effect this location of the street had on the property. The eleventh exception more clearly illustrates what we mean. In that, Mr. Atwood was asked, whether the opening of the street, "of the width and location proposed in these proceedings would accord with the best plan for the development of the property—by best, I mean the most advantageous to the owners of said property rather than the city as a whole." The city was not laying out a plan for the development of the property. It might well be that a street of less width and differently located would cause less damage to the owners than the one proposed, but if such a rule be adopted as the question suggested, a city might be compelled to adopt plans for the benefit of the owners of the land being condemned, rather than those for the public good. We do not understand that to be the law of this State. Sometimes it happens that a public improvement of this kind is materially and injuriously affected by the effort to please or benefit some particular person, but such action by public officials should be condemned, and not sanctioned by the courts. Of course owners are generally entitled to more compensation for taking 100 feet in width than they would be if only 60 feet were taken, and if the location is specially injurious, that fact can be considered in fixing the damages. The seventh, eleventh, fifteenth, sixteenth and eighteenth questions were properly held to be inadmissible. The fourteenth was harmless, as the witness had already said he "would not put any blind street out there." We see no special objection to the seventeenth, unless it was already sufficiently answered in the previous evidence. The twentieth did not require an expert to answer. If the jurors were men

of sufficient intelligence to sit on a jury, they could answer
the question as well as the witness.

So while there is no doubt that the appellants had the right
to show the uses for which the property was adaptable, we
can not agree with them as to the methods adopted for the
purpose, and we find no such error in any of the twenty ex-
ceptions already referred to as would justify us in reversing
the case.

It may be well to add here that in addition to evidence
being admitted on the subject, the lower Court by the appel-
lants' second prayer expressly instructed the jury that "in
arriving at the market value of the land to be taken, the jury
must take into consideration its availability for building lots
and for industrial purposes, if they find it had such avail-
ability; even though they also find that said land is not at
present used for such purposes," and that in fixing the dam-
ages for injury to the remaining land of the petitioners, "they
should also consider whether the availability, if any, of said
remaining land for use as building lots or for industrial pur-
poses will be decreased at all, and if so to what extent, by the
condemning and opening of Twenty-fifth street of the width
and at the location proposed in these proceedings."

The most important question in this case is the measure of
benefits to be assessed against the appellants. The City's
prayer number three, which was granted, so directly presents
the question as to suggest the advisability of considering that
before considering the other exceptions to the rulings on the
evidence. We will request the reporter to publish that prayer
in his report of the case. The time fixed by that instruction
for the consideration of the jury, as to the benefits was,
"after Twenty-fifth street shall have been opened, graded,
paved and curbed; it being proper to take into account the
fact that the property owner will be burdened when the street
shall be paved, with the special paving tax of fifteen cents for
each front foot on each side of said street for a period of ten
years as a matter of law; and that as a matter of fact, in
order to utilize his property, it will be necessary for the

property owner to pave the sidewalk and to grade the property back to a usable depth in connection with that street."

These proceedings were begun under "An Ordiance to *condemn and open* Twenty-fifth street from the easternmost side of Greenmount avenue (formerly York road) to the northwesternmost side of the Harford Turnpike road." The new charter of Baltimore City in Section 6 of Article 4, Public Local Laws, under the head of "General Powers," sub-head "Streets, Bridges and Highways," is subdivided in the revised edition of the charter published in 1915 by the Law Department of the City. Under subdivision "(A) Opening, Extending, Widening, Straightening or Closing up Streets," the city is authorized: "To provide for laying out, opening, extending, widening, straightening or closing up, in whole or in part, any street, square, lane or alley within the bounds of the city, which in its opinion the public welfare or convenience may require." It then provides for damages and benefits, and authorizes the city "to provide for assessing or levying, either generally on the whole assessable property of said city, or specially on the property of persons benefited, the whole or any part of the damages and expenses which it shall ascertain will be incurred in locating, opening, extending, widening, straightening, or closing up the whole or any part of any street, square, lane or alley in said city." After providing for appeals to the Baltimore City Court from the decisions of the Commissioners for Opening Streets, or other persons appointed by ordinance to ascertain the damage which will be caused or the benefit which will accrue to the owners by locating, opening, etc., any street, it contains this clause: "To provide for collecting and paying over the amount of compensation adjudged to each person entitled * * * before any street, square, lane or alley, in whole or in part, shall be so opened," etc. It authorizes the city to acquire the fee simple interest in any land for the purpose of opening, etc., the street. That part of the section says nothing whatever about grading, paving or curbing.

Later the section provides under the subdivision "(B) Grade Line of Streets" for grade lines and under subdivision "(C) Grading, Paving, Curbing, etc., Streets" it specifically gives authority "to provide by ordinance for grading, shelling, graveling, paving and curbing," or for re-grading, etc., of a street, lane or alley "now condemned, ceded, opened as a public highway, or which may hereafter be condemned, ceded, opened, widened, straightened or altered," etc. Then under sub-division "(D)" it authorizes the city to provide by general ordinance, subject to Section 85, for grading, graveling, shelling, paving or curbing or for regarding, etc., of any street, lane or alley, whenever the owners of a majority of the front feet of property binding such street, etc., shall apply for the same, etc. There are thus made distinct provisions for opening, etc., streets, from those in reference to grading, paving and curbing.

We have at some length referred to the charter, as it seems to us its provisions settle the question, independent of authority. When this ordinance was passed (1909) this section was the same as what we have stated above, and the revised edition of the charter only makes the sub-divisions and refers to the original acts and decisions of the courts for convenience. It is difficult to read those provisions of the charter and reach a conclusion other than that the Legislature intended the acquisition of the land for a street, before it was graded and paved. This proceeding was begun under what is above referred to as sub-division "(A)," and not under sub-division "(B)." At the time the ordinance was passed there was no provision in the charter for an ordinance to include the opening *and grading* of a street, but it was clearly intended to require the city to first condemn the land for the opening (if it was not dedicated or otherwise acquired), and then afterwards provide for the grading, paving and curbing. It is true that by the Act of 1912, Chapter 32, Section 175, which relates to the duties of the Commissioners for Opening Streets, was amended to read: "Whenever the Mayor and City Council shall hereafter by ordinance direct the Commis-

sioners for Opening Streets to lay out, open, extend, widen,
straighten, *grade* or close up, in whole or part, any street,"
etc., but that Act, which made a number of changes, expressly
provided that "nothing herein contained shall be construed
to affect any right or liability of any party accrued, *or any
proceeding begun or pending prior to the passage of this Act,*
but all such rights shall remain and such proceedings shall
continue, in the same manner, and to be of the same effect,
as if the provisions hereinabove mentioned had remained as
they were prior to the passage of this Act." Then it was
expressly limited to a case when the Mayor and City Council
"shall hereafter by ordinance direct," etc. But regardless of
that it is clear that the Legislature itself made a distinction
between opening and grading, paving or curbing, and there-
fore it is difficult to see how an ordinance for *opening* a
street can be construed to include the *grading, paving or curb-
ing.* Indeed, until the city acquires title to the land to be
used for the street, a number of practical difficulties suggest
themselves. Just how, in assessing benefits in a case like this,
the cost of paving a street can be accurately ascertained has
not been made clear. As we have seen from the charter, there
are a number of materials which can be used, either of which
will be a compliance with the statute, and the kind of ma-
terial used is a very important matter, as the cost must depend
upon that. It may be a long time before the street is paved,
and prices necessarily vary. If for example the price be esti-
mated now, and the street is not paved for a year or more,
who can say that the price may not be greatly reduced by
that time? In that instance the property owner would sus-
tain the loss, but on the other hand if the paving had been
estimated several years ago, the probabilities are that by this
time the cost of the material has greatly increased. JUDGE
MILLER said in *Dashiell* v. *Baltimore,* 45 Md. 615, 626: "A
street may be and often is opened and condemned for many
years before any steps are taken to pave it." In our judg-
ment the ordinance under which these proceedings were in-

stituted, and the statutes then in force, must control, and
the ordinance did not include grading, paving and curbing.

Our examination of the authorities strengthens the views
we have on the subject. It was said in *Reid* v. *City of
Toledo,* 18 Ohio, 161: "By the term opening we do not
understand the improvement of a street or highway by grad-
ing, culverting, etc.; the term is generally (we think always)
clearly distinguishable from such kind of improvement. The
term opening refers to the throwing open to the public what
before was appropriated to individual use, and the removing
of such obstructions as exist on the surface of the street,
rather than any artificial improvement on the surface. And
we think in the charter this distinction is very clearly drawn."
Or as said in 3 *Dillon on Munc. Cor.* (5th Ed.), sec. 1042:
"So authority to *open a street and assess the damages* on the
property benefited does not give the power to assess for any-
thing more than opening the street and paying for the right
of way; it does not include the power to assess other property
for the *improvement* of the street by grading, culverting, and
the like." In Mun. Con. in Maryland by the present Attor-
ney General, sec. 12, it is said: "The two systems for open-
ing and condemning streets, and for grading and paving
them are essentially different from each other. They are pro-
vided for by different laws and ordinances, executed by dif-
ferent officers and governed by different rules and regula-
tions." He referred to *Baltimore* v. *Porter,* 18 Md. 284;
*Dashiell* v. *Baltimore,* 45 Md. 615, and *Baltimore* v. *Hook,*
62 Md. 371. While it is true the conditions in those cases
differed from those in this case, the principles are for the
most part the same. In *Douglas* v. *Riggin,* 123 Md. 18, it
was said on page 22: "It constituted an opening of the street
for the use of the lots according to the evident sense in which
the term 'open' was used in the reservation under the agree-
ment of sale. It was plainly employed in this connection as
equivalent to the 'laying out' of the proposed street, and this
has been defined to mean 'the adoption of outlines or loca-
tions and not the work of construction or improvement.'

*Oberheim* v. *Reeside,* 116 Md. 273; 5 *Words and Phrases* 4037." See also *Baumann* v. *Ross,* 167 U. S. 548, 586; *Hutt* v. *Chicago,* 132 Ill. 352. In *Baltimore* v. *Smith,* 80 Md. 458, which case only involved benefits, and at that time the question of damages for opening a street was not open for review on appeal from benefits alone, the jury was instructed that the only matter for their inquiry was the amount of increase in the actual market value of the lots, fronting on the street opened, which would be caused by the acquisition through those proceedings by the city, of title to the land in the bed of the street to be used as a public street, and the verdict should be limited to such increase. The sixth prayer granted in *Baltimore* v. *Megary,* 122 Md. 20, was to the same effect.

There would seem to be no doubt that the city would still have the power to assess the property owners with the whole cost of grading, paving and curbing in a proceeding taken for paving, etc., after the property is condemned. Section 6 of the charter so authorizes. If the city has no authority to now assess for those purposes, but did so in this case, we are not prepared to say, as it contends, that it would be estopped from doing so again. There may be circumstances under which it would be estopped from collecting the same assessment twice, but in a case such as this where the property owners can undoubtedly be assessed for some benefits, if the measure of benefits established be erroneous, it would, to say the least, be difficult for them to be protected. But independent of that, if, as we think, the benefits cannot now properly include those to accrue from the street after it is "opened, graded, paved and curbed," the appellee has no right to assess the appellants with them in this proceeding and, besides, the appellants have the right to a correct interpretation of the law.

It was conceded by the appellee that it was formerly the established rule not to take into consideration the cost of grading, paving, etc., in a proceeding of this kind—for opening—but the learned solicitor contends that the contrary rule

has for some years been in force. We find no change in the
law to authorize it, which is applicable to this case. We
have already indicated that the Acts of 1912 and 1914 do
not apply.*   The provision quoted above from the Act of
1912 can leave no doubt as to that Act, and we find nothing
in the Act of 1914 indicating an intention on the part of the
Legislature to repeal or change that provision. The case of
*Cahill* v. *Baltimore,* 129 Md. 17, was relied on in support
of the city's contention, but without discussing the question
as to burden of proof, which is all of that case which can
be claimed to be applicable, it is sufficient to say that that
proceeding was not instituted until after the Act of 1912
was passed, and hence was not included in the saving clause
of that Act as this one was. As seen by reference to the first
appeal, *Baltimore* v. *Cahill,* 126 Md. 596, the ordinance was
not passed until April, 1913.

We do not understand the relevancy of evidence tending
to show that the city had not for some years been exercising
its powers of assessing the cost of grading and paving on the
abutting owners. If a municipality has the power to grade
and pave under either of several methods, and it for some
years adopts one of them, it does not follow that the other
can not be exercised, unless the charter is amended or the
law prohibits it. Administrations change, and frequently
with such changes entirely new ideas are introduced. Or
new conditions may require or suggest changes. But this
case shows the dangers of such evidence as the appellants con-
tend that ordinances of the city show that the witness was
mistaken. At any rate the evidence ought not to have been
admitted. It is proper to add that we think the jury would
be entitled to know, in cases where the cost of grading and
paving is involved, the width of the driveway and sidewalks
to be adopted, if the benefits are attempted to be shown in
advance of the paving and curbing. How can a jury tell
whether in the particular case the driveway is to be 40, 60,

---

*Ch. 32 of Acts of 1912; ch. 125 of Acts of 1914.

66 or other number of feet when the street condemned is 100
feet wide and it is left to the city authorities to determine
the width.   Such evidence as that in the 31st, 32nd and 33rd
exceptions was therefore inadmissible even under the appel-
lee's theory of the case as to the measure of benefits.   With-
out further pursuing this question, we are of the opinion
that under these proceedings the city was limited to benefits
as the result of the opening of the street, and such benefits
as grading, paving and curbing can not be considered.   There
was, therefore, error in granting the city's third and seventh
prayers.   The petitioners' first was properly rejected, as
it was entirely too broad.   Attorneys can and frequently
do explain to juries what the law is if not in conflict with
the granted instructions, or no instructions are given by the
Court on the particular subject.   Their second was granted.
The third was properly rejected for reasons stated above in
passing on the exceptions to evidence.   The fourth was prop-
erly rejected.   The fifth and sixth ought to have been granted.
The seventh was not necessary.   The eighth and ninth were
calculated to mislead.   The tenth could not have been granted
under the theory which prevailed in the lower Court, as it
would have been in conflict with the prayers granted, but
if at the new trial evidence is introduced in reference to the
grading, etc., as authorized in *Baltimore* v. *Smith,* in 80
Md. on page 471, an instruction as to its effect will be proper.
The eleventh was granted.   The twelfth and thirteenth are
immaterial in view of what we have said.

In the above discussion we think we have sufficiently re-
ferred to the questions involved in the exceptions to evidence
not already passed on to relieve us of discussing them fur-
ther.

*Rulings reversed and new trial awarded,*
*the appellee to pay the costs.*